1  SEAN P. REIS (SBN 184044)
   sreis@edelson.com
2  EDELSON MCGUIRE LLP
   30021 Tomas Street, Suite 300
3  Rancho Santa Margarita, California 92688
   Telephone: (949) 459-2124
4  Facsimile: (949) 459-2123

5  JAY EDELSON (Admitted *Pro Hac Vice*)
   jedelson@edelson.com
6  RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
7  BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
   brichman@edelson.com
8  BRADLEY M. BAGLIEN (Admitted *Pro Hac Vice*)
   cdore@edelson.com
9  BENJAMIN THOMASSEN (Admitted *Pro Hac Vice*)
   bthomassen@edelson.com
10 EDELSON MCGUIRE LLC
   350 North LaSalle Street, Suite 1300
11 Chicago, Illinois 60654
   Telephone: (312) 589-6370
12 Facsimile: (312) 589-6378

13  *Attorneys for Plaintiff and the putative classes*

14  ## UNITED STATES DISTRICT COURT

15  ## NORTHERN DISTRICT OF CALIFORNIA

16  CHRISTALEE ABREU, individually and
    on behalf of all others similarly situated,        Case No. 12-cv-00412-WHA
17
                                                       **FIRST AMENDED CLASS ACTION
18              *Plaintiff*,                            COMPLAINT FOR:**

19  v.                                                 **(1) Declaratory Relief**
                                                       **(2) Declaratory Relief**
20  SLIDE, INC., a Delaware Corporation, and           **(3) Violations of Cal. Civ. Code §§ 1750,** *et*
    GOOGLE, INC., a Delaware corporation,                  *seq.*
21                                                     **(4) Violations of Cal. Bus. & Prof. Code §§
                *Defendants*.                              17200,** *et seq.*
22                                                     **(5) Fraud in the Inducement**
                                                       **(6) Promissory Estoppel**
23                                                     **(7) Unjust Enrichment**

24                                                     **DEMAND FOR JURY TRIAL**

25

26

27

28

Plaintiff Christalee Abreu brings this First Amended Class Action Complaint ("Complaint") against Defendants Slide, Inc. ("Slide") and Google, Inc. ("Google") (collectively, "Defendants") and alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1.      This case is about Defendants Slide's and Google's use of an online gaming application—SuperPoke! Pets ("SPP")—to encourage their individual customers to spend hundreds or even thousands of real dollars on virtual currency, goods, and property under unconscionable terms that purported to give consumers no rights, value, or real interest in their purchases. Defendants retained the profits from their consumers' transactions, were obliged to do absolutely nothing in consideration of consumers' purchases, and could eliminate all access to consumers' money, goods, and property on a whim.

2.      Defendants decided to do just that and in August 2011, Defendants announced that their SPP service – along with all their customers' investments – would cease to exist within a six-month period.

## PARTIES

3.      Plaintiff Christalee Abreu ("Abreu" or "Plaintiff") is a natural person domiciled in the State of California.

4.      Defendant Google, Inc. is a corporation incorporated and existing under the laws of the State of Delaware with its principal place of business located at 1600 Ampitheatre Parkway, Mountain View, California 94043. Google does business throughout the United States, including in the State of California and this District.

5.      Defendant Slide, Inc. is a corporation incorporated and existing under the laws of the State of Delaware with its principal place of business at 1600 Ampitheatre Parkway, Mountain View, California 94043. Slide is a wholly owned subsidiary of Defendant Google. Slide does business throughout the United States, including in the State of California and this District.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one Class member is a citizen of a different state than Defendants, (b) the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

7.     This Court has personal jurisdiction over Defendants because both Defendants conduct significant business in California and the unlawful conduct alleged in the Complaint occurred in, was directed and/or emanated from California. Additionally, Google is headquartered in Mountain View, California.

8.     Venue is proper in this District because Google maintains its headquarters in this District and because the improper conduct alleged in this Complaint occurred in, was directed and/or emanated from this District.

**CONDUCT COMPLAINED OF**

**About SuperPoke! Pets**

9.     SuperPoke! Pets is an online video game that was developed and launched by Slide in or around April of 2008. The Internet-based game was initially launched and available to users through various social networking websites, such as Facebook and MySpace.

10.     In or around December 2008, and due to SPP's popularity, Slide re-located the game to its own website, www.spp.com, where new users could sign up without needing an accompanying membership to a social networking site.

11.     Also near the end of 2008, Slide released an SPP application for mobile devices, such as Apple's iPhone, allowing users to play the game remotely.

12.     At its most basic, SPP allows its users to adopt, name, and care for a virtual pet. The game allows users to interact with their pet, dress it in outfits, and customize the pet's virtual environment. SPP customers can also "friend" each other, allowing two associated customers to interact with each other's pets, as well as leave public comments about the pets and environments.

13.     As it grew in size and popularity, SPP fostered a large community of users – tens of thousands in number – that interacted with each other's virtual pets and communicated with other

users via SPP's community forums, which were hosted on the SPP website. Other communal features included the ability for users to trade and gift virtual items within the community, visit "neighbors" and add "friends," and participate in pet "play dates."

14.     SPP especially appealed to and found popularity with certain groups of users, including elderly, the disabled, and those who were unable to raise and care for a real-life pet.

15.     In August of 2010, Slide was acquired by Google. Thereafter, Defendants continued to support SPP, and continued to collect money from users.

**SPP's Revenue Model: "Virtual Items" and the VIP Program**

16.     Defendants did not charge an initial or monthly subscription fee for basic access to the SPP game. However, the design of the SPP platform encouraged customers to purchase in-game virtual items with real currency, which, once purchased, could be displayed on the paying customer's virtual pet and within the pet's virtual habitat, or be traded, sold, or gifted to another user.

17.     Virtual items in SPP could be obtained in two ways. First, "regular" items could be obtained using "coins," which users earned by performing various tasks and attaining achievements within the game. Second, "golden" items could be obtained solely by spending "gold," which had to be purchased with actual cash payments using a debit or credit card, or a user's PayPal account. During all relevant time periods, gold could be purchased for 10 cents on the dollar, with no cap on the amount that an individual user could buy. For example, $10 in actual currency could be used to purchase 100 gold.

18.     In designing and maintaining the SPP game, Defendants' primary goal was to induce users to purchase virtual gold. Accordingly, while Defendants made a small number of "regular" items immediately available to new SPP users, the vast majority of items, features, and content within SPP could be obtained only with gold.

19.     Defendants directly and expressly influenced the relative value of new virtual items introduced to the game by releasing golden items in limited quantities. For example, while a large quantity of 5,000 virtual hotdogs would be worth relatively little on an individual basis, a limited quantity of 10 virtual stuffed animals would be seen as rarer and, consequently, more desirable by

1  SPP customers and worth much more. Defendants highlighted the limited quantities of rare items to
2  encourage sales, by stating, for example, "Get them now, they will run out!"

3    20. Moreover, once limited items were "sold out," Defendants would often further
4  manipulate the SPP market by "restocking" limited items and selling them at a higher price. Thus,
5  Defendants' representations about the limited available quantity of certain items were in many
6  cases arbitrary and false—and always to Defendants' benefit.

7    21. Near the end of 2010, Defendants created an additional source of revenue by
8  introducing a new "VIP Status" subscription program, which allowed SPP users access to
9  "exclusive" premium content that was not otherwise available to traditional SPP players.
10 Defendants charged users $4.95 per month to sign up for and retain their VIP status each month.
11 On information and belief, thousands of SPP users signed up for the VIP Status program within the
12 first month of its introduction.

13 **The Secondary Market for SPP Virtual Items**

14   22. Virtual items purchased within SPP are fully transferable among SPP users, leading
15 to the development of a robust secondary market to buy and sell "used" items. Indeed, Defendants
16 encouraged customers to buy and sell virtual items amongst each other through "trades," which
17 could either be gratuitous gifts or transactions for actual cash utilizing third parties, such as PayPal,
18 to coordinate the exchange of cash for virtual items.

19   23. To facilitate such trades, Defendants allowed users to advertise for and solicit trades
20 on user forums run on their website (www.spp.com). Much like established online auction websites,
21 such as Ebay, users can "rate" each transaction they have with a seller, and such information is
22 made available to other SPP users who may later purchase virtual goods from the same seller.

23   24. Because of the scarcity of certain items released by Defendants, the value of virtual
24 items often grew exponentially once they appeared on the SPP secondary market.

25   25. Defendants enjoyed on-going monetary benefits from its own facilitation of and
26 continued influence over the SPP secondary market, as shifts in the value of virtual goods
27 incentivized SPP users to purchase newly released gold items from Defendants (again, using "gold"
28 that was purchased with actual cash) which could later be sold and/or traded.

26.     In June 2010, Defendants announced a new "Authorized Reseller Program," which allowed certain SPP users to sell virtual goods directly to other SPP customers. The Authorized Reseller Program expressly granted authorized SPP users a license to use "assets and logos from SPP," and the ability to deliver virtual goods directly to other SPP users' accounts. On information and belief, Authorized Resellers paid a fee directly to Defendants in exchange for the right to sell virtual items under the program.

27.     Thus, Defendants allowed, encouraged, and assisted their customers in buying and selling virtual items for cash—whether directly through the SPP game (using gold) or through the SPP-hosted and endorsed trading platforms—and were well aware of the value of such items to SPP users.

28.     The ability to participate in the trading and selling of virtual items contributed to the appeal of SPP and, in large part, was a motivating factor for users to pay real money for these items. Users who purchased virtual items in SPP reasonably expected to have the ability to trade or sell items following their purchase.

**SPP Users' Rights to Virtual Goods and Currency**

29.     While SPP is intentionally designed to encourage and incentivize users to purchase (and later re-sell or trade) virtual currency, goods, and property within the game, Defendants purport to give users no rights, value, or other tangible or transferable interest in their purchases and property.

30.     In particular, the Terms of Use ("TOU") that purportedly govern the use of SPP provide in relevant part that: "Other than a limited, personal, revocable, non-transferable, non-sublicensable license to use Virtual Goods or Virtual Currency in the Service, you have no right or title in or to any such Virtual Goods or Virtual Currency appearing or originating in the Service, or any other attributes associated with use of the Service or stored within the Service."

31.     Moreover, the TOU purport to give Defendants "the absolute right to manage, regulate, control, modify and/or eliminate such Virtual Currency and/or Virtual Goods as it sees fit in its sole discretion, and the Company shall have no liability to you or anyone for the exercise of such rights."

32.     While the TOU purport to grant SPP users a "limited license right" to use the virtual products and services they purchased with cash, those same terms provide that such use was limited by, essentially, whether or not Defendants felt like allowing it. In particular, the terms described customers' limited license as a right to use the products they purchased "when, as, and if allowed."

33.     Further, while aspects of the TOU give an impression of objective fairness towards its users (stating, for example, that any user may "lose all Virtual Goods and Virtual currencies in your account" *if* Defendants "delete your account as provided in these Terms"), in reality those terms are governed by no standards at all (stating, in the same sentence, that Defendants "may delete your account for any reason or no reason at all").

34.     In other words, while Defendants encourage users to spend hundreds or even thousands of dollars on virtual gold and are aware of the demonstrable value of virtual items, Defendants simultaneously attempt to assign no value to users' purchases and purport to reserve the right to eliminate them at any time, for any reason, and without notice.

**Defendants' June 2011 Announcement of Changes**

35.     In early June 2011, Defendants announced several changes to SPP through the game's official online forums. The most noteworthy announcement was the discontinuation of the SPP "gold" purchasing program. There, Defendants announced that SPP users could no longer purchase gold using cash, and that Defendants would no longer be releasing new "gold items" for purchase.

36.     Because numerous users had gold balances remaining in their accounts at the time of the announcement, Defendants additionally instructed SPP users to spend any outstanding gold on existing virtual items on or before June 30, 2011. After that date, Defendants stated that no gold items would be available, and the value of any gold remaining in users' accounts would disappear and would not be refunded.

37.     Defendants' announcements caused uproar among SPP users, many of whom worried that their investments of both time and money into the SPP application were in jeopardy. Users flooded the forums with questions about the meaning behind the announcements, expressing concern that Defendants intended to shut down the site and discontinue the game.

38.     In response, Defendants expressly reassured users that the reason for the changes was that "SPP had become a mature product, capable of standing on its own," that "[w]e have always been focused on features that would one day allow SPP to thrive on its own, and we feel it has now reached that point," and that rumors of discontinuing support for SPP entirely "in the near future" were untrue. Defendants knew or should have known that these statements were false at the time that they were made.

39.     Defendants also promised customers that "it [was] completely untrue" that SPP would be turned off in July 2011 or "in the near future." Defendants promised that they had "no plans to shut the site down" because Slide had been working to "optimize SPP.com to be as efficient as possible and require minimal maintenance and resources." Defendants knew or should have known that these statements were false at the time that they were made.

40.     Defendants also used the June 2011 announcements as a final sales pitch to convince users to sign up for SPP VIP Status. Following the promises regarding SPP's longevity and continued support described above, Defendants informed users that "[a]fter July 1[, 2011], we won't be accepting any new VIP subscriptions," but promised those who signed up and paid for the program before June 30, 2011 that they would enjoy continued access to the VIP Status "indefinitely" and "for FREE."

41.     To further its campaign to register users for VIP Status, Defendants programmed a prompt to appear on customers' screens after logging into SPP. That prompt warned customers – even those already signed up for the VIP Status program – that they would lose their VIP Status indefinitely unless they re-entered their debit or credit card information by June 30, 2011.

**SPP Customers React to Defendants' Promises**

42.     Defendants' June 2011 announcements had the calculated impact of increasing the value and demand for both the VIP Status and existing in-game items.

43.     Because users were told that those who paid for VIP Status before June 30, 2011 would be able to enjoy the program "for FREE" and "indefinitely" after that date, thousands of SPP users either renewed their monthly VIP subscriptions or signed up for the VIP Status program for the first time.

44.     Similarly, because Defendants had stopped releasing new, in-game content and because Defendants actively encouraged and facilitated the sale of virtual items on the secondary market, customers purchased and stockpiled – both through SPP's own user forums and through Authorized Resellers – numerous virtual items, anticipating that such items would maintain and even increase in value after June 30, 2011.

**Defendants' Sudden Cancellation of the SPP Platform**

45.     In July 2011, Defendants eliminated all gold balances remaining in SPP customer accounts. Defendants did not offer to refund the cash value of gold that was not spent through SPP prior to that date.

46.     In August 2011, and despite the assurances made regarding the continued support of SPP and the lifetime benefits purchased by many users, Defendants announced that the SPP gaming application would be terminated within six months. At that time, Defendants explained that SPP users would lose online access to their virtual pet and all in-game goods that were purchased either directly through SPP, third parties, or otherwise.

47.     In a subsequent announcement on or about September 6, 2011, Defendants confirmed that they "will be taking SPP offline on March 6, 2012."

48.     However, Defendants failed to provide a viable method or procedure for consumers to retain their in-game purchases or property after SPP was terminated. Instead, Defendants offered only two limited options to consumers, neither of which allows SPP players to fully access their purchases or their pets' environments: (1) Defendants advised SPP customers that they could take "screenshots" of their pets, habitats, and other purchased items (akin to taking a still photograph of their purchases); and (2) Defendants released an "SPP Lite" application, which, in effect, takes animated screenshots of those same items, but will not display all items, limits the functionality of other items, and otherwise prevents users from accessing their in-game purchases.

49.     Accordingly, and because both options entirely strip the value from consumers' original purchases (or fail to allow customers to even display certain purchased items), SPP users each stand to lose access to virtual property that cost many users hundreds or even thousands of dollars.

50.     Even though Defendants announced the termination date of the SPP game and recognized that SPP virtual items would soon become effectively valueless, Defendants continued to allow existing users to purchase virtual items for cash through the Authorized Reseller Program and allowed new users to join SPP throughout September 2011.

### FACTS RELATING TO PLAINTIFF ABREU

51.     Plaintiff Christalee Abreu joined SPP in 2009 and was an active user since that time until SPP was terminated. As of August 2011, Plaintiff had created and maintained three active virtual pets through three separate SPP accounts.

52.     Plaintiff has purchased numerous in-game items with actual cash that she has used to develop habitats for her virtual pets. Since she began playing SPP, Plaintiff has spent in excess of $1,000 purchasing gold from Defendants as well as in-game items from third-party sellers. Plaintiff also actively participated in the sale and trade of virtual items on SPP's secondary market, created and facilitated by Defendants.

53.     Soon after the program was announced in late 2010, Plaintiff purchased VIP access for one of her SPP accounts. Plaintiff continued to pay for VIP status for this account in each successive month through June 2011.

54.     In June 2011, Plaintiff viewed Defendants' announcements encouraging SPP players to purchase VIP subscriptions before Defendants eliminated the service. In response, and in reliance on Defendants' representation that it would continue to support SPP, Plaintiff purchased VIP subscriptions for her two remaining accounts, expecting that access would continue "indefinitely".

55.     Prior to August 27, 2011, Plaintiff had no knowledge that Defendants intended to terminate the SPP game. Plaintiff continued to purchase in-game items on the secondary market up until Defendants' announcement that they planned to terminate SPP in March 2012. At the time of purchase, Plaintiff expected to have the ability to trade and sell her items at any time.

56.     In March 2012, Defendants shut down the SPP game and Plaintiff lost access to her accounts, virtual pets, and all items of value that she had accrued over the previous three years.

1

**CLASS ALLEGATIONS**

2       57.     Plaintiff Christalee Abreu brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and

3   23(b)(3) on behalf of herself and two classes of similarly situated individuals (the "Classes")

4   defined as follows:

5           **SPP Class:**  All persons in the United States who had one or more registered SuperPoke!

6           Pets accounts and purchased virtual gold or in-game items from SPP-certified resellers.

7           **VIP Class:**  All persons in the United States who purchased one or more months of the

8           SuperPoke! Pets VIP status program.

9   Excluded from the Class are 1) any Judge or Magistrate presiding over this action and members of

10  their families; 2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any

11  entity in which the Defendants or their parents have a controlling interest and their current or

12  former employees, officers and directors; 3) Plaintiff's counsel, 4) persons who properly execute

13  and file a timely request for exclusion from the Classes; 5) all persons who have previously had

14  claims similar to those alleged herein finally adjudicated or who have released their claims against

15  Defendants; and 6) the legal representatives, successors or assigns of any such excluded persons.

16  Further excluded are Plaintiff's attorneys.

17      58.     **Numerosity**: The exact number of Class members is unknown to Plaintiff at this

18  time, but on information and belief, there are thousands of Class members throughout the country,

19  making joinder of each individual member impracticable. Ultimately, the Class members will be

20  easily identified through Defendants' records.

21      59.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the

22  Classes. Plaintiff and the Classes sustained damages as a result of Defendants' uniform wrongful

23  conduct during transactions with Plaintiff and the Classes. Plaintiff's claims are typical of the

24  claims of all of the other members of the Classes.

25      60.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect

26  the interests of the Classes, and has retained counsel competent and experienced in complex

27  litigation and class actions. Plaintiff has no interests antagonistic to those of the Classes, and

28  Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to

1   vigorously prosecuting this action on behalf of the members of the Classes, and have the financial

2   resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other

3   members of the Classes.

4       61.   **Commonality and Predominance**: Common questions of law and fact exist as to all

5   members of the Classes and predominate over any questions affecting only individual members,

6   including:

7           a.   Whether Defendants' TOU, and the provisions contained there, are invalid

8                and unenforceable;

9           b.   Whether Defendants were aware of the impending termination of the SPP

10               application prior to the June 2011 announcements described herein;

11          c.   Whether Defendants manipulated the primary or secondary markets for SPP

12               virtual goods;

13          d.   Whether Defendants' conduct violated California's Consumer Legal

14               Remedies Act with respect to the Classes;

15          e.   Whether Defendants' conduct violated California's Unfair Competition Law

16               with respect to the Classes;

17          f.   Whether Defendants' conduct constituted fraud in the inducement with

18               respect to the Classes;

19          g.   Whether Plaintiff and the Classes are entitled to restitution as a result of

20               Defendants' conduct; and

21          h.   Whether Defendants' TOU affect the relationship between Defendants and

22               the Classes.

23      62.   **Superiority**: This class action is appropriate for certification because class

24   proceedings are superior to all other available methods for the fair and efficient adjudication of this

25   controversy and joinder of all members of the Classes is impracticable. The damages suffered by

26   the individual members of the Classes will likely be small relative to the burden and expense of

27   individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct.

28   Thus, it would be virtually impossible for the individual members of the Classes to obtain effective

relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

63.    **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply and affect members of the Classes uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

64.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Definitions of the Classes" based on facts learned in discovery.

### FIRST CAUSE OF ACTION
### Declaratory Relief – Invalidity of "Get Out of Jail Free" Clauses Under California Law
### (Individually and on behalf of the Classes)

65.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

66.    The TOU that purportedly governs the use of the SPP game is an adhesion contract because Defendants and Plaintiff did not have equal bargaining power at the time the contract was made, Plaintiff had no opportunity to negotiate any specific terms in the TOU, and the TOU are designed in a manner solely favoring Defendants.

67.    As a key component of Defendants' fraudulent and unfair scheme, Defendants included a series of exculpatory provisions in the TOU in an attempt to fully insulate them from civil liability.

68.     In the parlance of the industry, these invalid terms are called "Get Out of Jail Free Clauses."

69.     Under the TOU, Defendants reserve the right to "delete your account for any reason or for no reason at all," which causes a consumer to "lose all Virtual Goods and Virtual Currencies in your account," many of which were purchased with actual currency. Defendants retain "the absolute right to manage, regulate, control, modify and/or eliminate such Virtual Currency and/or Virtual Goods as it sees fit in its sole discretion, and [Defendants] shall have no liability to you or anyone for the exercise of such rights."

70.     Similarly, in a section entitled "ADDITIONAL RIGHTS OF THE COMPANY," the TOU again grants Defendants "the right to refuse registration of, or cancel Your user account and/or User ID in its discretion for any reason or for no reason.  Any content that has been uploaded through the Service, any Virtual Goods, Virtual Currency, Music…or other characteristic of your account…may be deleted at any time without notice to you. The Company is exempt from liability to any person for any claim based upon its good faith termination of an account or disabling of access to or removal of any content."

71.     Accordingly, while Defendants intentionally designed the SPP platform to encourage users to spend actual money on virtual currency and goods, Defendants reserved the right to unilaterally cancel and permanently eliminate these purchases at their sole and unfettered discretion. While the TOU purport to limit Defendants' liability only to claims arising from "good faith" account terminations, the TOU simultaneously provide that "any reason"—or indeed, no reason at all—will constitute "good faith" and shield Defendants from liability.

72.     Notably, there are no limitations on Defendants' right to seek indemnification from its users, such that the TOU would require users to indemnify Defendants for entirely frivolous or groundless lawsuits, or even disputes arising from the user's own claims against Defendants (such as disputes between Defendants and applicable insurance carriers).

73.     The TOU also purport to limit the period for which a consumer may recover monetary damages. Under a section entitled "DISCLAIMERS; LIMITATIONS; WAIVERS OF LIABILITY," the TOS provides that "UNDER NO CIRCUMSTANCES WILL THE COMPANY

PARTY BE LIABLE TO YOU FOR MORE THAN THE AMOUNT YOU HAVE PAID THE COMPANY IN THE NINETY (90) DAYS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU FIRST ASSERT ANY…CLAIM."

74.     This exculpatory provision is designed to and does ensure that, even if a consumer discovers a viable claim against Defendants and immediately brings a lawsuit, the consumer will be entitled to little or no money damages because the claim may have arisen earlier than 90 days immediately preceding the date on which the claim is asserted. For the majority of consumers who do not immediately discover their claims—even if such claims were concealed by Defendants—or cannot secure representation, the exculpatory clause severely limits, if not completely bars, the consumers' potential recovery.

75.     Defendants further immunize themselves from liability by limiting all applicable statutes of limitations period. Under a heading entitled "Statute of Limitations," the TOS provides that "You and the Company both agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of the Service, Terms or Privacy Policy must be filed within ONE (1) YEAR after such claim or cause of action arose or be forever barred."

76.     Defendants also include a one-sided arbitration clause, positioned at the end of the TOU under a section entitled "MISCELLANEOUS", that does the following:

a.     Allows Defendants to bring any claim for injunctive relief in state or federal court, but requires that consumers irrevocably waive all rights to seek injunctive or any other equitable relief.

b.     Uses the "commercial arbitration rules" of the American Arbitration Association, which under R-4 (a)(ii) of their rules, Plaintiff would be required to pay a $775 filing fee.

c.     Provides no opportunity for consumers to recover costs or attorneys' fees even if their arbitrations are successful.

d.     Requires consumers to initiate and engage in "informal negotiations" with Defendants for "at least thirty (30) days before initiating any arbitration or court proceeding," thereby delaying consumers' ability to seek redress and

1    potentially lowering the amount of damages available pursuant to the

2    limitations described in paragraph 74, above.

3    77.    The sum total of Defendants' numerous "Get out of Jail Free Clauses" mean, that if

4    Plaintiff wanted the chance to recover her money, goods, or property after Defendants eliminated

5    them without cause, the following rules would govern:

6        a.    She would be required to pay an initial filing fee up to $775 for an

7              arbitration;

8        b.    Unlike Defendants, she would have no right to seek injunctive relief;

9        c.    She would face insurmountable hurdles in establishing monetary damages,

10             since Defendants can purportedly eliminate all Virtual Goods and Currency

11             without notice "for any reason or for no reason" and Defendants are "exempt

12             from liability" as a result of such action;

13       d.    She would only be allowed to seek monetary damages based on monies paid

14             to Defendants in the 90 days prior to notifying Defendants of her claim,

15             which would effectively be reduced to 60 days while Plaintiff attempted to

16             engage in the required "informal negotiations" prior to filing her complaint;

17       e.    Even if she won, she would not be entitled to recover any of her actual costs

18             and attorneys fees, regardless of Defendants' level of culpability; and

19       f.    If she lost she would be responsible for paying all the costs borne by

20             Defendants, including their attorneys' fees.

21   78.    No reasonable attorney would represent a consumer in such arbitration on a

22   contingency basis. (And indeed, a reasonable attorney would be duty bound to recommend that the

23   consumer not pay him or her to bring such arbitration on a fee-based compensation model.)

24   79.    A reasonably sophisticated individual would not be able to navigate the applicable

25   Commercial Arbitration Rules, let alone successfully argue that the Indemnification and Limitations

26   clauses are not enforceable.

27   80.    As Defendants know, under these sets of rules, no rational economic actor would

28   ever initiate arbitration against it.

81.     On information and belief, no consumer has ever initiated arbitration against Defendants under these TOU.

82.     Pursuant to its Consumer Due Process Protocol, the American Arbitration Association would not accept or preside over arbitration between Plaintiff and Defendants based upon the one-sided and unfair terms contained in Defendants' TOU.

83.     Under California law, it is illegal to insert exculpatory clauses into consumer adhesion contracts. Specifically, Cal. Civ. Code § 1668 states:

> All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

84.     Moreover, California Courts have found contracts which contain an exculpatory clause to be unconscionable and against public policy at the time they are made, and therefore, in violation of Cal. Civ. Code § 1670.5, which states:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result

85.     Defendants' exculpatory provisions effectively prevent Plaintiff from asserting her claims against them.

86.     Specifically, Defendants' exercise of their deletion provision caused Plaintiff to permanently lose access to her SPP account, including access to her three VIP Status subscriptions and all of her virtual property, while protecting Defendants from any liability for such actions.

87.     Further, under Defendants' statute of limitations provision, Plaintiff is unable to pursue her claims that may have occurred more than one year prior to the filing of this Complaint.

88.     Likewise, due to the ninety-day monetary damages limit, Plaintiff is unable to make a claim to recover the hundreds of dollars she spent prior to the ninety days before she commenced her claim. And, in the instant case, so as to fulfill the time limit set out by Defendants, Plaintiff would have had to file duplicative claims— one within three months of when Defendants made their false statements in their June announcements, and one again when Defendants actually deleted

her account in March.

89.     For each claim, Plaintiff would have no other recourse than to submit to Defendants' arbitration provision whereupon she would have to file her claim in arbitration and pay the filing fee, without any chance of recovery for attorneys' fees, her filing fees and expenses, or any monetary damages outside of those incurred in the preceding three months.

90.     Thus, Defendants' exculpatory provisions effectively deny Plaintiff any meaningful opportunity to pursue her claims against Defendants.

91.     Accordingly, Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and Defendants with respect to Defendants' "Get Out of Jail Free Clauses" and a declaration that Defendants' "Get Out of Jail Free Clauses," both separately and together, are unconscionable and unenforceable pursuant to Cal. Civ. Code § 1668 and Cal. Civ. Code § 1670.5.

92.     Plaintiff and members of the Classes, on the one hand, and Defendants on the other have adverse legal interests, and there is a substantial controversy between Plaintiff and the members of the Classes, on the one, and Defendants on the other, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to whether Defendants' "Get Out of Jail Free Clauses" are unconscionable and unenforceable pursuant to Cal. Civ. Code § 1668 and Cal. Civ. Code § 1670.5.

93.     Pursuant to Code of Civil Procedure 1060, such a declaration is necessary and appropriate at this time in order that Plaintiff and Defendants may ascertain their relative rights and duties with respect to the TOU.

## SECOND CAUSE OF ACTION
### Declaratory Relief – Defendants' Terms of Use Lack Mutuality and Are Illusory
### (Individually and on behalf of the Classes)

94.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

95.     Based on the allegations made throughout this Complaint and in Plaintiff's First Cause of Action (incorporated herein), Defendants' TOU lack mutuality of obligation and are illusory.

96.     Specifically, the TOU purport to give SPP users no rights, value, or other interest in their purchases and purport to give Defendants the right to unilaterally terminate users' accounts and eliminate their purchases without notice and in Defendants' sole, unfettered discretion.

97.     Moreover, Plaintiff has no meaningful way to enforce the TOU and Defendants thus have no obligation to honor any of their contractual obligations.

98.     Members of the Classes and Defendants have adverse legal interests, and there is a substantial controversy between members of the Classes and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to whether Defendants' Terms of Use Agreement is invalid and unenforceable against Plaintiff and the Classes.

99.     Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and Defendants with respect to the TOU and a declaration that Defendants' TOU is invalid and unenforceable.

100.    Pursuant to Code of Civil Procedure 1060, such a declaration is necessary and appropriate at this time in order that Plaintiff and Defendants may ascertain their relative rights and duties with respect to the Terms of Use Agreement.

### THIRD CAUSE OF ACTION
### Violations of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (Individually and on behalf of the Classes)

101.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

102.    The Consumers Legal Remedies Act ("CLRA") prohibits the act, use or employment by an person of any deception, fraud, false pretense, misrepresentation, concealment, suppression, or omission of any material fact with intent that others rely upon such act in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

103.    The CLRA applies to Defendants' actions and conduct as described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

104.    Defendants are "persons" as defined by Cal. Civ. Code  § 1761(c).

105.    Plaintiff and each member of the Classes are "consumers" as defined by Cal. Civ. Code § 1761(d).

106.    SPP and the products provided therefrom are "goods" and/or "services" within the meaning of Cal. Civ. Code § 1761(a) and (b), respectively.

107.    As described herein, Defendants engaged in deceptive practices, unlawful methods of competition, and/or unfair acts as defined by Cal. Civ. Code §§ 1750, *et seq*., to the detriment of Plaintiff and the Classes.

108.    Defendants acted with knowledge, and intentionally and unlawfully brought harm upon Plaintiff and the Classes by deceptively inducing Plaintiff and the Classes to spend money and purchase "gold" and "gold items" while retaining the right to eliminate such purchases without notice or cause, to engage in secondary markets for the goods, and to join the "VIP Status" program while knowing the imminent termination of the application would eliminate the value of the goods and services.

109.    Specifically, Defendants violated Cal. Civ. Code § 1750 in at least the following respects:

       a.    In violation of § 1770(5), representing that goods or services have characteristics, uses, or benefits which they do not have;

       b.    In violation of § 1770(9), advertising goods and services with intent not to sell them as advertised;

       c.    In violation of § 1770(14), representing that a transaction confers or involves rights, remedies, or obligations which it does not involve; and

       d.    In violation of § 1770(19), inserting an unconscionable provision in a contract.

110.    Defendants violated Section 1770(5) by representing that "VIP Status" subscriptions and related benefits would last "indefinitely," when in fact, they did not. Defendants further represented that SPP would remain "available" and "on-line" when in fact, it was discontinued shortly thereafter.

111.    Defendants violated Section 1770(9) by advertising that VIP subscription access and

access to the SPP game would be long-lasting, specifically stating that the program would last "for the future" and "indefinitely" and that SPP would remain "available" and "on-line" with no plans to discontinue SPP for the "foreseeable future." Defendants knew or should have known that these advertisements were false and therefore, did not intend to sell their goods and/or services as advertised.

112.    Defendants violated Section 1770(14) by representing that Plaintiff and the Classes would have the right to access their virtual pets and items, and that VIP subscription access and access to the SPP game would last "for the future" and "indefinitely". Defendants knew or should have known that these advertisements were false.

113.    Defendants violated 1770(19) by inserting numerous exculpatory provisions in their TOU.

114.    Defendants' unfair and/or deceptive acts and/or practices occurred repeatedly in Defendants' business, and were capable of deceiving a substantial portion of the public who registered for Defendants' application.

115.    The facts misrepresented and/or omitted by Defendants to Plaintiff and the Classes are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase products from Defendants or the Defendants' affiliate dealers and join Defendants' "VIP Status" program. Had Plaintiff and the Classes known the application would be terminated and the goods would be rendered worthless, they would not have purchased goods from Defendants, their affiliate dealers, or joined (or renewed subscriptions for) the "VIP Status" program.

116.    As a direct and proximate result of Defendants' violation of Cal. Civ. Code §§ 1750, *et seq.*, Plaintiff and each member of the Classes have suffered harm in the form of monies paid to Defendants for "VIP Status" subscriptions and in-game currency and goods, as well as a diminution in value of the virtual items that they purchased from Defendants. Plaintiff, on behalf of herself and the Classes, seeks injunctive relief. For the sake of clarity, Plaintiff specifically disclaims any right to recover damages under the CLRA at this time.

**FOURTH CAUSE OF ACTION**
**Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(Individually and on behalf of the Classes)**

117.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

118.     California's Unfair Competition Law ("UCL") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

119.     The UCL prohibits any unlawful, unfair or fraudulent business act or practice. A business practice need only meet one of the three criteria to be considered unfair competition. An unlawful business practice is anything that can properly be called a business practice and that at the same time is forbidden by law. An unfair business practice is any such practice whose harm to the victim outweighs its benefits.

120.     As described above, Defendants have violated the "unlawful" prong of the UCL by violating the CLRA.

121.     As described herein, Defendants have violated the "unfair" prong of the UCL by inducing Plaintiff and members of the Classes to purchase goods and services from Defendants and Defendants' affiliates. As described herein and among other examples of unfair conduct, Defendants lured consumers into buying "gold," entering into third party transactions with Defendants' "affiliates" and/or joining the "VIP Status" program while: (1) offering nothing in consideration for users' cash payments for gold and virtual items; (2) reserving the unilateral right to terminate user accounts and eliminate user purchases without notice or cause; and (3) failing to disclose material information regarding the impending termination of the SPP application. The injuries caused by Defendants' conduct are not outweighed by any countervailing benefits to consumers or competition, and Plaintiff and members of the Classes could not have reasonably avoided the injuries they sustained.

122.     As described herein, Defendants have also violated the "fraudulent" prong of the UCL by knowingly and willfully making false and misleading statements about the continued operation of the SPP application and VIP Status program, and failing to disclose material information regarding the impending termination of the application and the total loss of value of

---

1   "gold," "gold items," and the money spent on the VIP Status program.

2       123.    Defendants' false representations and omissions were likely to mislead Plaintiff and

3   members of the Classes acting reasonably under the circumstances, and constitutes a deceptive

4   trade practice in violation of the UCL.

5       124.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent acts,

6   Plaintiff and each member of the Classes have suffered injury in fact and lost money by purchasing

7   "gold" within the SPP gaming application, by buying goods from Defendants' "affiliates," and by

8   paying for access to Defendants' VIP Status program. Plaintiff and the Classes have also been

9   harmed by the diminution in value of the virtual items that they purchased.

10      125.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining

11  Defendants from continuing to engage in the unfair and unlawful conduct described herein.

12  Plaintiff seeks an order requiring Defendant to (1) immediately cease the unlawful practices alleged

13  in this Complaint; (2) make full restitution of all funds wrongfully obtained; (3) immediately

14  reverse the permanent termination of the application; and (4) pay interest, attorneys' fees, and costs

15  pursuant to Cal. Code Civ. Proc. § 1021.5.

16                              **FIFTH CAUSE OF ACTION**
                                 **Fraud in the Inducement**
17                        **(Individually and on behalf of the Classes)**

18      126.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

19  herein.

20      127.    As described herein, Defendants made false and misleading statements regarding the

21  continued, long-term and "indefinite" operation of the SPP gaming application and/or failed to

22  disclose material information regarding the impending termination of the SPP application.

23  Defendants knew or should have known that these statements were false at the time they were

24  made.

25      128.    Through the misrepresentations and omissions detailed herein, Defendants

26  wrongfully induced Plaintiff and the members of the VIP Class to purchase or renew VIP Status

27  program subscriptions in June 2011, knowing that the SPP application would be terminated shortly

28  thereafter. Specifically, Defendants represented that users who paid for VIP Status in June would

"pay for VIP once and receive the benefits indefinitely" and that "if you're an active VIP subscriber on June 30th, you get all the features and benefits of VIP membership for free for the future." Defendants made these misrepresentations for the sole purpose of inducing consumers to pay for VIP Status and omitted the material fact that the program would be soon be terminated.

129.    Further, Defendants wrongfully induced Plaintiff and the members of the SPP Class to purchase "gold items" by making false representations regarding the limited quantity of such items, by failing to disclose the actual quantity of such items that would eventually be offered for sale through the SPP application, and by encouraging users to continue to purchase "gold" virtual items knowing that the SPP application would be terminated shortly thereafter.

130.    Defendants knew or should have known that their misrepresentations and omissions regarding the long-term availability of the SPP application and VIP Status program, as well as the limited quantity and long-term availability of "gold" items, would be misleading to Plaintiff and the Classes acting reasonably under the circumstances.

131.    Defendants intended that Plaintiff and the other members of the Classes would rely upon their misrepresentations and omissions regarding the long-term availability of the SPP application and VIP Status program, as well as the limited quantity and long-term availability of "gold" items.

132.    Plaintiff and the other members of the Classes relied upon Defendants' misrepresentations and omissions as evidenced by their purchase or renewal of subscriptions to the VIP Status program in June 2011 and purchase of gold items.

133.    In deceiving Plaintiff and members of the Classes as described herein, Defendants engaged in fraudulent practices designed to induce consumers to register for or renew subscriptions to Defendant's VIP Status program and spend money to purchase virtual gold and virtual items.

134.    As a direct and proximate result of Defendants' misrepresentations and omissions as alleged herein, Plaintiff and members of the Classes suffered damages in the form of monies paid to Defendants.

## SIXTH CAUSE OF ACTION
### Promissory Estoppel
### (Individually and on behalf of the Classes)

135.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

136.    Defendants clearly and unambiguously promised to Plaintiff and the Classes that "SPP is NOT going away," there are "no plans to shut the site down" and "the app will remain available and online for the foreseeable future." Defendants intended for Plaintiff and the Classes to act in reliance upon these promises. Specifically, Defendants intended for Plaintiff and the Classes to purchase new or additional VIP subscriptions, continue paying for existing VIP subscriptions, and purchase virtual items.

137.    In reliance upon Defendants' promises that the SPP application would not be discontinued, Plaintiff and members of the Classes purchased new or additional VIP Status program subscriptions and/or virtual items on SPP's secondary markets. But for Defendants' promises, Plaintiff and the Classes would not have made these purchases.

138.    Plaintiff's and the Classes' reliance was reasonable and foreseeable by Defendants.

139.    As a result of their reliance on Defendants' promises, Plaintiff and members of the Classes suffered detriment in the form of monies paid for VIP Status program subscriptions and virtual items.

140.    Plaintiff, on behalf of herself and the Classes, seeks restitution and disgorgement of all monies unlawfully obtained by Defendants.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (Individually and on behalf of the Classes)

141.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

142.    Plaintiff and the Classes have conferred a benefit upon Defendants. Defendants have received and retained money belonging to Plaintiff and the Classes as a result of Defendants' unlawful and deceptive practices.

143.    Defendants appreciate or have knowledge of said benefit.

144.    Under principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and the Classes that they unjustly received as result of their conduct described herein.

145.    Plaintiff and members of the Classes have suffered financial loss as a direct result of Defendants' conduct.

146.    Plaintiff, on behalf of herself and the Classes, seek restitution and disgorgement of all monies unlawfully obtained by Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Christalee Abreu, on behalf of herself and all others similarly situated, respectfully requests that the Court enter an Order as follows:

a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Christalee Abreu class representative, and appointing her counsel class counsel;

b)    Declaring that the Terms of Use that purportedly govern the use of the SPP application are invalid because: (1) the TOU include numerous invalid and unconscionable exculpatory clauses, commonly known as "Get Out of Jail Free Clauses;" and (2) the TOU lack mutuality and are illusory;

c)    Declaring that Defendants' actions, as set out above, violate the CLRA (Cal. Civ. Code §§ 1750, *et seq.*) and the UCL (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); and that Defendants' conduct constitutes fraud in the inducement, promissory estoppel, and unjust enrichment;

d)    Awarding preliminary and permanent equitable and injunctive relief for the Classes, including: (1) enjoining Defendants from engaging in further violations of the CLRA and UCL; (2) awarding restitution and disgorgement of all monies unjustly received and retained by Defendants; and (3) all other equitable relief that this Court deems appropriate;

e)    Awarding actual damages to Plaintiff and the Classes;

f)      Awarding Plaintiff and the Classes reasonable costs and attorneys' fees;

g)      Awarding Plaintiff and the Classes pre- and post-judgment interest;

h)      Awarding Plaintiff and the Classes punitive damages, where appropriate; and

i)      Providing such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

Dated: May 15, 2012                    **CHRISTALEE ABREU**, individually and on
                                        behalf of all others similarly situated,

                                        By: /s/ Benjamin H. Richman
                                              One of Plaintiff's Attorneys

                                        SEAN P. REIS (SBN 184044)
                                        sreis@edelson.com
                                        EDELSON MCGUIRE LLP
                                        30021 Tomas Street, Suite 300
                                        Rancho Santa Margarita, California 92688
                                        Telephone: (949) 459-2124
                                        Facsimile: (949) 459-2123

                                        JAY EDELSON (Admitted *Pro Hac Vice*)
                                        jedelson@edelson.com
                                        RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
                                        rbalabanian@edelson.com
                                        BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
                                        brichman@edelson.com
                                        BRADLEY M. BAGLIEN (Admitted *Pro Hac Vice*)
                                        cdore@edelson.com
                                        BENJAMIN THOMASSEN (Admitted *Pro Hac Vice*)
                                        bthomassen@edelson.com
                                        EDELSON MCGUIRE LLC
                                        350 North LaSalle Street, Suite 1300
                                        Chicago, Illinois 60654
                                        Telephone: (312) 589-6370
                                        Facsimile: (312) 589-6378

1

## **CERTIFICATE OF SERVICE**

2

I, Benjamin H. Richman, an attorney, hereby certify that on May 15, 2012, I served the above and foregoing *First Amended Class Action Complaint*, by a causing true and accurate copy of such paper to by filed and served upon all counsel of record via the Court's CM/ECF electronically filing system, on this the 15th day of May, 2012.

3

4

/s/ Benjamin H. Richman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28